v. Kappos Mr. Solander, good morning. Your honors, may it please the court. In this case, it's a patent case and I'm going to discuss patents. The invention at issue here is the first shelf-stable topical pharmaceutical composition that contains both a corticosteroid and a vitamin D derivative that is useful for treating psoriasis. Your honors, the invention here is important because before it was made, patients who were prescribed a corticosteroid and a vitamin D derivative were instructed to apply those two compounds at separate times during the day, one in the morning and one in the evening. That led to patient compliance problems and therefore the treatment outcomes were not ideal. Can I ask a big picture question? Of what effect is the claim construction debate on the validity determination? I don't believe it has any effect. I don't believe it had any effect at the board below and I don't think the board should have decided a claim construction issue that had no effect. The problem we have now is that we are stuck with a board decision that says the claim means this and we are concerned, of course, that in future litigation the court may find that binding or highly persuasive when we think it's wrong. Okay, so it would be mooted if we agree with the board that that's not valid, right? Well, of course, yes, if that's not valid. But if we were to disagree on the validity determination, then we still have to decide the claim construction. You could decide or you could vacate it. I think one way to consider it is perhaps as an advisory opinion because it was unnecessary to decide. And if you consider it that way, you could vacate it and leave it for another day when it might be ripe to decide. But otherwise, we think it's incorrect. Okay, all right. Go ahead. I'm sorry. Now you can go back. So the reason why patients had to take these two drugs separately is because the formulation that was optimized for a corticosteroid was incompatible with a vitamin D derivative. And a formulation that was optimized for a vitamin D derivative was incompatible with a corticosteroid. And what I mean by incompatible is that the formulation would degrade the molecule. So if you apply both to your skin at the same time, even though you're doing it simultaneously with application, it still would result in some degradation which would result in a patient getting less than the amount that they were supposed to get. Okay, so your application describes all the prior art as having this problem, this instability problem. Other than the application itself and your declaration or affidavit that you submitted, what else is in the record that shows us that what was disclosed in Serapin-Dixtine was unstable? As far as the instability of the Serapin-Dixtine formulations, I believe the only thing that shows them to be unstable is the experimental evidence. I don't believe anybody else in the ARC ever made Serapin-Dixtine formulations and showed them to degrade. The evidence with respect to the application of the don't apply it at the same time, that's in literature which is cited both within the patent and as part of the appendix. You can find those in our brief on pages 6 and 7, all the citations to that. So there's literature out there that says these two compounds are incompatible in the formulations that are optimized for them. And there's literature out there that says don't apply them simultaneously to patients. So there was a need for a single formulation that combined both a corticosteroid and a vitamin D derivative, and that was the problem that was solved by the invention here. Okay, well I'm still trying to understand. Serapin-Dixtine do, at least in passing, refer to corticosteroids being combined, correct? Yes. All right, and I give you that it's just they don't say it's the B-L and N-L, and it's not the primary focus of those references. Yes. But what about those references? The board found they don't teach away. So what about those references shows that it wouldn't have been an appropriate vehicle for a combination? Okay, we're not denying that Serapin-Dixtine disclosed a combination of formulations. What we're saying is that those formulations were not shelf-stable. That's the important aspect of our invention. Our invention allows the patient to take the tube home and use it over a six-month period. Okay, so that goes back to my question. What in the record shows me that they're not shelf-stable? The declarations where we made the formulations in Serapin-Dixtine tested their stability and showed that they degraded. All of those can be found in our brief on pages. So you're referring primarily then to your declaration? Yes, to the experimental evidence. During the prosecution of the patent, we were faced with the rejection of Serapin-Dixtine. The people at Leo Pharma, in response to those rejections, set up experiments where they made the formulations using almond oil, propylene glycol, water, alcohols, the solvents that are used in Serapin-Dixtine. And they showed that those formulations were unstable. Just as was predicted in the art, the corticosteroid and the vitamin D derivative degraded. The molecules degraded and became less potent. Quickly, in fact. Not over a long period of time. Now, Mr. Solani, the Serap reference has eight classes and ten compositions. Why didn't you make an argument that, or do you accept maybe the board's response to that, that a person of skill in the art would quickly know how to select the right class and the right composition? I'm afraid I don't understand what you mean by class. Do you mean classes of solvents or of the compounds themselves? They had eight different classes you're talking about. Well, in general, what I think the board has done is engaged in a hindsight analysis where they picked and chose aspects of these various pieces of prior art, ignoring, I believe, other aspects. Yes, but you didn't really make that argument. That's the point. You didn't make the selection invention argument. You didn't cite the Cuban or get us into that line of cases at all. Do you accept the board's estimation that they would know how to select from amongst these classes and compositions quickly? No, Your Honor. I believe, certainly in the briefs on appeal here, we certainly took issue with the board's picking and choosing. We used that language, and I believe we criticized the board's opinion. They used the term picking and choosing, said that a person of ordinary skill in the art would pick and choose among the references and try various things and figure out which ones work. We said that that is an improper way to analyze the prior art here. A related question is the selection of the starting reference. What's your argument as to the starting reference that was chosen here? The board said in its opinion at JA-18 that syrup is the closest prior art. If you accept that, then the reference composition would be an aqueous formulation containing a corticosteroid and a vitamin D derivative. The question is, what would a person of ordinary skill in the art do with that formulation? The first thing they would have to do is figure out that it's unstable. They would have to understand that when you made that formulation, the syrup says nothing about stability, neither does Dixien and Puri, for that matter. Because of the instability of the composition, syrup would not be an appropriate starting point. A procedure would never start there because you're starting on something that's not workable. Your Honor, I would say they would start there because it's the only thing in the prior art that discloses a combination of the two ingredients. That's why I believe the board's calling it the closest prior art. They would discover once they started that it doesn't work. Then, what do you do? What the board says you would do is go to a completely different path, Puri. Puri, which came out years before either syrup or Dixien, does not disclose a combination. It discloses only a corticosteroid. It discloses it in combination with a POP-15 sterile ether, which so happens to be one of the ingredients in our claim, and also which is the ingredient that's used in the commercial environment of this claim, taquinase. The board says you would do that, not because you're trying to solve the stability problem, which is what you would encounter after you tested the ingredients in syrup, but rather for another reason, that Puri discloses some advantages to the POP-15 sterile ether. But doesn't the board almost say, putting Puri aside, somebody skilled in the art, would just start trying every possible thing out there, every possible solvent out there? I mean, that's the way I almost read the board opinion. It says you would just keep trying until you found something. Well, if that's what they're saying, and I agree with you, one way of reading the opinion is that I think they have alternatives. Well, certainly they do say you would pick and choose amongst lists, they say. That's totally improper. There's no expectation of success. There's no finite number of predictable solutions, as KSR talks about. That's basically an infinite number of possibilities that one would have to investigate. And you're talking about conducting stability studies. These aren't things that a bench chemist can do in a day. You have to formulate it, then you have to put it on stability, and if it fails some months later, then you have to start again, because you don't know what you did wrong. Okay, so we have a – you can see there's a general motivation to combine D3 with a corticosteroid. There's a long-felt E for it. Right. That's what we say. But what your point is is that there's no motivation to combine it with this particular solvent. That's correct. There's nothing in the art that would tell you that the solvent C that we claim would work. The POP-15. The POP-15. There are other solvents of similar characteristics, but the POP-15 is what the board focuses on. And just to go back briefly to why the board says you would look at Turing – I see I'm in my rebuttal time, and I'll just take a second to answer this. To go back to why you would look at Bates IKSR, and what they say is that something can be obvious if someone was trying to solve a problem other than what the inventors were looking at. The inventors here were looking at a stability problem. And so if somebody came upon this formulation because they were trying to solve a different problem, that can be obvious. I believe that's what the board was saying when they cited KSR and these other advantages for POP-15 that are listed in Turing. The problem is you have to have a problem. The Supreme Court is quite clear that it has to be a known, identified problem that a person of ordinary skill and art would try to solve. There were no problems in seropendictine with irritability, with the antifungal and antibacterial nature of the solvents that are disclosed there. They're very common solvents – almond oil, propylene glycol, water, alcohols. There were no problems disclosed there. So nobody would be going to Turing after looking at syrup in order to solve the problems to find the advantages of POP-15 that were present in the Turing formulation. I'll be going now. Thank you, Mr. Solander. Ms. Nelson. Ms. Nelson. Thank you, Your Honor. I'm going to help you start, but I'm not going to help you. Turing's around for 22 years. If it's so obvious to combine it to solve all these problems, which nobody recognized, why did it take 22 years to get there? This Court has long held that the amount of time between the prior art and for something to become obvious is not the standard to be applied. Well, but if there's a long-felt need and there's a clear motivation to make these combinations and the market is crying for it and the problem is crying for it, 22 years, all of your skilled artisans can't come up with it? That does say something, doesn't it? I don't think it does, Your Honor. Does the Board address that at all? That was never raised before the Board. Well, it's raised by the record. The Board itself ought to be asking that question, shouldn't it? The Board does not. If it's so obvious, why does it sit around for 22 years unused, unrecognized? Well, it's not that it was unrecognized. I think Turing had provided evidence... Somebody had solved this problem earlier then? Which problem? This stability problem, the problem of these two compounds, the vitamin D analog and the steroid, degrading each other. I think that's the problem with Leo's case, is that the motivation need not be the same as the inventor's, and that's what the Board and the examiner properly recognized, is that there was motivation in the prior art to arrive at the claimed competition. And we understand... And if that was so clear, then we're back to the 22 years. I'm still looking for an answer on that. If it's so simple, and it's got to be obvious, routine, simple, a person of ordinary skill can do it. 22 years? Lots of advancements take time, and that doesn't mean that it's not obvious just because it's not happened. But it tends to... Could the amount of time that Chief Rader's talking about come into play when you also have a teaching away element in this obviousness analysis? Frankly... I mean, could it have taken that long? Because Serap and Dixon actually part away. They're saying this is an unstable combination. I respectfully disagree with that. Serap and Dixon do not teach away. Serap and Dixon provide... In fact, they both claim that they also have examples of combinations of a vitamin D analog and a corticosteroid, and nowhere in either of those references is there any mention of a problem with stability. There's no mention that there is... They don't teach stability either, right? Well, they don't say that they're stable, but I think it's... And they don't claim stability? They don't claim stability, but they do teach other advantages from combining a corticosteroid and... Right, and your friend on the other side concedes that they teach that it would be nice to put the two together. But to put the two together and to make them in a stable formula that's actually suitable for its intended use is a whole different animal. Well, they have examples in the disclosure that show a combination of a vitamin D analog and a corticosteroid, and they actually claim them as well, and they're presumed to be used for their intended purpose. There's absolutely no teaching that there's a problem with stability. But there's no teaching that they are stable? They do not say anything expressed, but I don't think... Isn't there often a mention in the recognition of the problem? I think of something as simple as the post-it notes, that all of the paper and the glue that were used in that had been around for many decades, but no one really saw the problem that that glue could be used to replace paper clips and staples. Isn't that similar to what's happening here? The invention was recognizing the stability problem, and then going back 22 years to find POP 15 that might resolve it. I don't think that is what's at issue here in that case.  Or does it dismiss and say, oh well, they can be solving a different problem. I think the board has exactly said that. They said there are different problems. But then they've got the problem of the invention can be recognizing the problem, can't it? Their claim to invention is supposedly addressed to recognizing the problem, but that problem, that story of stability, would be an intrinsic property once you combine these three... Now, step back a minute. But nobody made that combination for 22 years because they didn't even recognize the problem. They have made a combination of B and... There's three components, the steroid... They've done A and B, but they've never gone back and got that POP 15 because they didn't think there was a need to. And we have inventors with the insight to do it. But once they did, which was prior to this invention, once they had combined the POP 15 with a corticosteroid, which was done prior to this invention, it then became obvious to make the complete combination of a vitamin D analog, a corticosteroid, and a POP 15 solvent. Now, the board made that, reached their motivation to combine conclusions without ever looking or referencing in any way the declaration that was submitted. Why is that? Why wasn't that relevant? What one of skill in the art would actually know. They did look at the declaration evidence and they discussed it just as the examiner had. But they found that the declaration evidence had certain deficiencies that the examiner had recognized. And then they went on to say, you know, even if there was some teaching that some combinations would have been more stable than others, there was plenty of motivation to arrive... There's a strong case of obviousness here. This invention really boils down to three different components and two of those components were taught by two prior art references and the two other components were taught by a third. And there was motivation in all of those references for making those combinations. And with all of that motivation, there would be plenty of reason to arrive at a composition that comprised all three of those components. And that's essentially what the board's analysis was and found that the secondary... their evidence of unexpected results was insufficient to affect that strong case of obviousness. I want to go to one of the arguments that you make in your brief because it really troubles me and that is that, you know, you say that they're not allowed to cite anything from the record to us that wasn't specifically pointed out to the board. Now, I get the fact that we say you can't make a substantive argument to us that you didn't make to the board, but the notion that the board has no obligation to review the record is kind of appalling to me. I mean, if we were to decide a case and ignore large portions of the record just because the page limitations didn't allow certain things to be pointed out to us specifically, people would think we were fools. So I don't understand how the board can say that it has no obligation to review the actual record before it. The board has an obligation and the rules actually state that they will review the evidence that's in the evidence appendix. And the argument that we made that some of those references that they referred to... They were all referenced in the application itself, were they not? Some of them were included at various times during the prosecution, but they were not. The board has, in its rules... I have it back there, the board rules. There's a board rule that expressly says that they will only review the evidence that's actually in the evidence appendix. But if in the appendix, the application's there and it cites all these prior art references, then the board says that's not in the record? If it's not in the actual appendix. Now, some of them were in the appendix and our point was simply that they hadn't called out this, this particular article. Right, so the board doesn't even have to read the appendix? The board does look at the appendix and our point was simply that they hadn't really made those specific arguments to the board. But the board does look at the appendix. Let me just turn briefly to the claim construction issue because I'm really troubled by this. I mean, if the board is supposed to apply the broadest reasonable construction, then how possibly could they take a limitation from the spec and incorporate that into the claim for purposes of their claim construction? They take one example. No, Your Honor. What the board did, and it's fully consistent with this court's case law, is it basically looked at the broadest reasonable interpretation consistent with the specification. And it looked at the specification and first it found out the express definition of what that term meant. And then it tried to look at the specification to find out how to interpret that term. Why is it doing that at all? Because that's what it's supposed to do. They can't find a definition divorced from the specification. They look first at the specification as the principal guide. They took one example and limited the claim to that example. It's not to the example. What the example teaches, and it's labeled as a stability test, it's an accelerated test for stability. And in fact, their own experts... But they didn't look to the common and ordinary meaning of these phrases. They just ignored that. They didn't ignore it, but they found that the intrinsic evidence is much more... gave greater weight to the intrinsic evidence. And although Leo tried to make an argument... You start with the claims and the plain meaning of the words in the claims, and if absent that, then you move to the specification and the remainder of the intrinsic evidence? No. I believe that Phillips has said that the proper starting point would be the claims, and then you move to the specification. Moreover, before the patent office... But storage stable is not a horribly ambiguous term, is it? Well, I think... You need to rush out and grab a test from somewhere. I think it can be ambiguous and you have to have a test. And quite frankly, this accelerated test that was applied and that's in their specification is an accelerated test that has direct correspondence to a real-time test. And in fact, their expert at 540... I believe it's... A545 of the record acknowledges that these accelerated tests, in particular three months at 40 degrees, fairly represent what would be a real-time stability test. Can I ask you about the picking and choosing, sir? This eight classes, the lotions, applicants, etc., and ten compositions, dilutants, buffers, binders, etc. Aren't you kind of picking and choosing to get to where you want to get to? I don't believe that we are picking and choosing. As I mentioned, we really... This invention is to three different... As they explain in their specification and as they define the invention, it's the POPC solvent that really is the key to this invention. And that permits a vitamin D analog and a corticosteroid to be included in a composition together. And the problem... Then what they've tried to do is come in and sort of... And that's the part that had been around for more than two decades and nobody else had used it. Well, the problem is that TURI has used it and TURI is prior art. And TURI teaches that exact solvent, POP15, which is their preferred embodiment. And once TURI taught that and taught using that for... In fact, TURI in the column one of his patent... To increase stability in vitamin D analogs and steroids? No. TURI taught it for a different reason. That's the inventive feature. Well, that's the reason why... That's the reason why they came up with their invention. But TURI's reason was that POP15, as they explain in column one of their patent, the propylene glycol had suffered from certain problems, that it was irritating and non-lubricating, and POP15 improved upon that. And in addition, as you move to column two of the patent, they explain that it also has antifungal and antibacterial properties, which permits you to manufacture these compositions for less cost because you do not need to use preservative or at least less preservative. What about the fact that TURI itself actually says that the antibacterial, antifungal properties that he's discussing aren't sufficiently great to be of therapeutic value? It just says they're sufficient to allow for compounding or manufacture, but not really for therapeutic value. Aren't we talking about something that needs to be stable for its intended use, which is a therapeutic use? I don't think... I think they simply said that they don't have particular effects in terms of improving the therapy, but it doesn't mean that there isn't a use for the POP15 solvent, which they've explained several advantages to using the POP15, both the antifungal and antibacterial properties, which improve manufacturing, as well as the fact that it's lubricating and non-irritating. All right, thank you. Ms. Nelson? Mr. Schlender, you have two and a half minutes. Your Honor, I think the Board and the PTO has given too little consideration to the secondary considerations in this case. There was a substantial unmet need. That need... The need argued fully before the Board? Yes, Your Honor. The patent itself explains the long-felt unmet need in this case. The Board was aware that the patent in suit covered a commercial FDA-approved product that contained a combination that treated psoriasis. They were aware of that. And that is not a common thing when you're at the Board, that you have a patent that is old enough to have a commercially-approved drug as part of it. You also have, Your Honor, all of the advantages that are listed in column nine of the patent with respect to this particular invention, including things like better patient tolerance, better patient compliance, and therefore better outcomes than using the prior art methods of giving each individual drug separately. And so what the Board said basically was, we have this prima facie case, which we believe is very, very weak. They believed it was very, very strong. They then said, well, we'll look at these secondary considerations as a sort of an afterthought, and we find that they don't trump the prima facie case. We would urge that the proper way to look at it is in conjunction with the in-ray cyclopenzaprine case, which I understand was a district court case, an appeal from a district court. But this is more akin to a district court. This was an inter-party free exam. There was a requester. Is trumping the right standard, or is this really to be part of the equation from the outset, that it's a four-part test instead of a three-part test with a trumping feature? You said it more eloquently than I can. The answer to your question is emphatically yes. That is the way it should be treated. It should be treated that way. In a district court case, it should be treated that way by the patent office. They should look at secondary considerations before forming their opinion of obviousness. And the reason is, the reason that secondary considerations are so important is it guards against the exact type of hindsight analysis you have here. You have Serap and Dickstein. Oh, they have problems? Okay, well, how do you solve the problems? I submit what happened here is they looked at the claim, and then they went back in the prior arc, found the solvent C in the prior arc, and said, okay, well, now we have to justify why you would pick solvent C. And there was cherry-picking going on even there, because if you go beyond column two of Turey to column five of Turey, Turey teaches that you can use all of these additives, which the record shows those additives, if you accept that teaching of Turey, would have led to degradation of item D. So not only do you have to read Turey very carefully and very selectively, you have to know about Turey, you have to read it very selectively, and then you have to know how to incorporate it into that teaching. If there are no further questions, I thank you, Mr. Stollmeyer. That concludes our morning.